IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

WILLIAM WADE HENDERSON, III,       )
                                   )
            Plaintiff,             )        Case No. 4:13-cv-00055
                                   )
v.                                 )        **MEMORANDUM OPINION**
                                   )
DEPT. MOLLY MOTLEY,                )        By: Hon. Jackson L. Kiser
*Pittsylvania County Sheriff Deputy*, )            Senior United States District Judge
                                   )
            Defendant.             )


On September 16, 2013, Plaintiff William W. Henderson, III, ("Plaintiff") filed a § 1983

civil rights action against Defendant Pittsylvania County Sheriff Deputy Molly Motley ("Deputy

Motley") for alleged violations of the Fourth Amendment. On June 13, 2014, Deputy Motley

filed a Motion for Summary Judgment asserting, *inter alia*, that she is entitled to qualified

immunity [ECF No. 13]. On July 8, 2014, both parties appeared before me for a hearing on

Deputy Motley's Motion. After careful review and consideration, and for the reasons stated

below, I will grant in part and deny in part Deputy Motley's Motion for Summary Judgment.

Deputy Motley is not entitled to qualified immunity, but I find no evidence or allegations to

support a claim for punitive damages. I will deny Plaintiff's Motion for Summary Judgment as

untimely.

## I.      STATEMENT OF FACTS AND PROCEDURAL HISTORY

At the summary judgment stage of proceedings, I am required to view the facts and draw

reasonable inferences in the light most favorable to the party opposing the motion. *Scott v.

Harris*, 550 U.S. 372, 378 (2007) (citations omitted). "In qualified immunity cases, this usually

means adopting . . . the plaintiff's version of the facts." *Id.* at 378. In this case, accounts of the

- 1 -

relevant events provided by Plaintiff and Deputy Motley largely coincide. Where the facts are in dispute, those facts and all reasonable inferences drawn therefrom are viewed in the light most favorable to Plaintiff.

On September 2, 2011, Deputy Motley began an investigation into multiple reports of grand larceny involving the theft of air conditioning units. (Decl. of Molly Motley ¶ 2 [ECF No. 14-1] (hereinafter "Motley Decl.").) Three of the reported thefts were from homes that had recently been serviced by Plaintiff, a technician employed by Jack Holmes of JA Holmes. (*Id.*) According to Deputy Motley, Mr. Holmes reported to Investigator Anita Davis of the Pittsylvania County Sheriff's office that Plaintiff had serviced several of the properties from which units had been stolen. (*Id.*) Deputy Motley followed up with Mr. Holmes, who allegedly reported that Plaintiff had worked on the properties, had a criminal record, and had spent time in a penitentiary for grand larceny. (*Id.* ¶ 3.) Deputy Motley also learned that Plaintiff had an extensive criminal history.[1]

On September 17, 2011, Deputy Motley traveled to interview Plaintiff at his residence in Patrick Springs, Virginia. (*Id.* ¶ 5.) Prior to leaving Pittsylvania County, Deputy Motley inquired as to whether a Patrick County deputy would need to accompany her to the residence. (*Id.* ¶ 6.) She was advised that she only needed to contact Patrick County dispatch to advise them that she was entering their jurisdiction, and she complied with the instruction. (*Id.*) Just before entering Plaintiff's driveway, Deputy Motley reports that she attempted to contact

---

[1] According to Deputy Motley, at the time of her investigation, Plaintiff had nine convictions for grand larceny, two convictions for statutory burglary, four convictions for breaking and entering, one conviction for attempted robbery, eleven convictions for parole violations, and a conviction for malicious wounding. (Motley Decl. ¶ 4.) Deputy Motley also indicates that Plaintiff's criminal record included indictments for use of a firearm in the commission of a felony (twice), wearing a mask on private property without consent, conspiracy to escape from prison, conspiracy to commit malicious wounding, conspiracy to rob a jailer, and possession of an instrument of escape. (*Id.*) Further, she was aware that Plaintiff had been indicted and was awaiting trial on charges of abduction and assault and battery. (*Id.*)

- 2 -

Pittsylvania County dispatch via cell phone to advise them of her location, but found that she did not have sufficient signal to complete the call.[2]  (*Id.* ¶ 7.)  She also reports being unable to reach anyone from Patrick County or Pittsylvania County via the radio.[3]

Plaintiff resides in a mobile home in a wooded and remote area of Patrick County, approximately 100 yards from the nearest local road.  (*Id.* ¶¶ 9, 11; Ex. 1.)  According to Deputy Motley, there were no other homes in sight of Plaintiff's residence, and only limited visibility of his residence from the road.  (Motley Decl. ¶ 9.)  When she arrived, Deputy Motley parked her cruiser behind three vehicles that were parked on a short end of the mobile home.[4]  (*Id.* ¶ 11.)  Although Deputy Motley indicates that she "noticed a portion of a white vehicle, possibly a van, parked at the rear of his mobile home," Plaintiff contends that the vehicle was neither visible from his driveway nor from the road.  (*Id.* ¶ 10; Pl.'s Resp. 1.)  For purposes of this Motion, I must therefore assume that the van was not visible from the driveway.

Prior to making contact with anyone at the residence, Deputy Motley performed what she characterizes as a "protective sweep" of the area.  (Motley Decl. ¶ 13.)  In her words, "given the number of vehicles parked at the side of the trailer, and the white vehicle parked at the rear of the mobile home, for the purpose of officer safety, [she] wanted to determine if there were other individuals behind the mobile home that could pose a threat" to her.  (*Id.*)  Deputy Motley notes

---

[2] Plaintiff claims that he "has cell phone signal anywhere on the property and signal is full less [than] 1/8 of a mile" from his home, and argues that Deputy Motley could have easily called for backup.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. 1–2 [ECF No. 20] (hereinafter "Pl.'s Resp.").).)

[3] Deputy Motley explains that the Sheriff department's radio system operated on an analog band, and from two counties away, she was out of range of her dispatch and unable to reach anyone from Pittsylvania County via the radio.  (Motley Decl. ¶ 7.)  Since the frequency of the Patrick County dispatch center was not programmed into her radio system, Deputy Motley reports that she was also unable to contact anyone from Patrick County for backup.  (*Id.* ¶ 8.)

[4] Plaintiff argues that only one of the vehicles in his driveway was "tagged" and could be legally driven.  (Pl.'s Resp. 2.)

that she is a petite woman of 5'3", was alone in her cruiser without backup in a remote area, and explains that she had experienced a "close call with officer safety under similar circumstances" a few months earlier.[5] (*Id.* ¶ 12.)

Deputy Motley walked toward the back of the mobile home. (*Id.* ¶ 13.) After traveling some distance away from the path to the front door,[6] she was able to see into the backyard. (*Id.*; Pl.'s Resp. 5.) At that point, Deputy Motley indicates that she could see a white van with the rear door open and numerous air conditioning units around the van.[7] (Motley Decl. ¶ 14.) She reports being unable to see whether anyone was inside of the van. (*Id.*) Citing a concern for officer safety, Deputy Motley claims that she "needed to conduct a protective sweep of the van[.]" (*Id.* ¶ 15.)

As she approached the van, Deputy Motley remembered seeing a "be on the lookout" order for a similar white panel van with a ladder on the roof that was suspected in other larceny cases. (*Id.* ¶ 16.) She explains that, in order to secure the evidence, another officer would have been necessary to "lock down the property" while she obtained a search warrant. (*Id.* ¶ 17.) Further, Deputy Motley contends that it could have taken substantial time for another law

---

[5] As Deputy Motley describes the prior incident:

> That case also involved an interview at a mobile home with multiple occupants. I approached the front of the trailer and entered the trailer with permission. Once inside, I learned that multiple individuals were outside of the trailer, and from my vantage point, I had no ability to determine the number of individuals outside and could not ascertain their physical characteristics or whether they possessed weapons, all of which compromised my safety.

(Motley Decl. ¶ 12.)

[6] Deputy Motley contends that she "only needed to walk 10-15 feet out of the pathway to the front door to see into the back yard," but Plaintiff argues that she had to travel a greater distance to walk behind the house "before she could even get a glance of a van." (Motley Decl. ¶ 13; Pl.'s Resp. 5.)

[7] Photographs, included as Exhibits 3–11, depict approximately six to twelve large air conditioning units in the general vicinity of a white van.

- 4 -

enforcement officer to arrive if she left the property to go down the road and call for backup. (*Id.*) Concerned that the evidence might be destroyed or removed if she left the property, Deputy Motley proceeded to photograph the van and the air conditioning units. (*Id.* ¶ 18.)

After taking some photographs, Deputy Motley returned to the front of the trailer to interview Plaintiff.[8] (*Id.* ¶ 19.) Deputy Motley knocked on the front door, and Plaintiff responded. (*Id.*) Plaintiff invited her into the living room, and Deputy Motley inquired whether anyone else was present in the home. (*Id.*) Plaintiff indicated that his girlfriend, Angela Reagans, was in the back changing clothes. (*Id.*) In a recorded interview, Deputy Motley informed Plaintiff of the nature of her investigation, and asked him a series of questions about his potential involvement. (*Id.* ¶ 20; Def.'s Mot. Summ. J. Ex. 12 [ECF No. 14-1] (hereinafter "Interview Tr.").) Plaintiff explained that the air conditioning units in his backyard were old, unwanted units that he and his coworkers intended to turn in for a Christmas bonus. (Interview Tr. 3.)

During the conversation, Deputy Motley asked Plaintiff for permission to photograph the air conditioning units on his property in the following exchange:

> Deputy Motley: . . . and if you don't mind I'm going back here and take a few pictures of the air conditioning units and all that OK?
>
> Plaintiff: You know I mean I wish you didn't cause Jack[']s going to know and it's going to be bull shit behind it.
>
> Deputy Motley: We're not talking, this has nothing to do with Jack. You know Jack has not filed a complaint I mean.
>
> Plaintiff: I mean the best thing to do on the now you see is get a number.
>
> Deputy Motley: Uh hum.

---

[8] Although Deputy Motley does not indicate how far into the backyard she traveled, Plaintiff argues that she "walk[ed] behind the home, stop[ped] and illegally obtain[ed] photos, then [went] back in the very same direction . . . to the front of the home, leaving 1/4 of the area around the home . . . unswept[.]" (Pl.'s Resp. 2.)

- 5 -

Plaintiff:  Cause you can look at a picture and say well that is it.

Deputy Motley:  Right, right.

Plaintiff:  But uh you got a copy of the invoices right?

(*Id.* at 4; Motley Decl. ¶ 20.)  Deputy Motley reports that as they talked, Plaintiff accompanied her while they walked back around to the backyard of the mobile home.  (Motley Decl. ¶ 21.)

According to Deputy Motley, Plaintiff examined the invoice copies she showed him, and he told her that Jack Holmes should have documentation of all of the serial numbers.  (Motley Decl. ¶ 21.)  She reports that Mr. Holmes had already informed her that Plaintiff was responsible for documenting the serial numbers, and had failed to do so when completing the invoices for service calls.[9]  (*Id.*)  As they continued to talk, Deputy Motley asked again:

Deputy Motley:  That's all the invoices there.  Uh but anyway if you don't mind
        I'll just take a few pictures of like I say this is just for our records, it's not
        as far as I'm concerned Jack Holmes, he's not filed a complaint.  These
        home owners that have had air conditioners stolen filed the complaint so
        uh if it's not their air conditioners it's not anything[.]

Plaintiff:  Yeah

Deputy Motley:  You know?

Plaintiff:  Yeah

(Interview Tr. 5; Motley Decl. ¶ 22.)  At that point, she reportedly believed that she had his consent to photograph the air conditioning units for the purpose of securing their serial numbers to cross-reference with records from the homeowners.  (Motley Decl. ¶ 22.)  Deputy Motley

---

[9] It is unclear whether Deputy Motley was referring to all service calls, or just those where the unit was later stolen.

reports that she again began to photograph the units, this time with Plaintiff standing next to her. (*Id.*) Although she noticed cutting tools lying nearby, she did not seize them.[10]

After photographing the air conditioning units, Deputy Motley concluded the interview and left the residence. (Motley Decl. ¶ 24.) She "drove down [Plaintiff's] lengthy driveway, and continued approximately 1/3 of a mile to a little church off the side of the road[.]" (*Id.*) She notified Pittsylvania County dispatch that she was leaving that location. (*Id.*) Deputy Motley does not indicate how she was able to reach Pittsylvania County dispatch but, in light of her previous statement that their analog radios were ineffective from two counties away, it appears that she used a cell phone to contact Pittsylvania County.

Deputy Motley was unable to match any of the serial numbers of the units she observed at Plaintiff's home to units stolen from Pittsylvania County. (*Id.* ¶ 25.) After sending the serial numbers and photographs to neighboring counties, investigators from Patrick County confirmed that one of the serial numbers from a unit at Plaintiff's residence matched a unit that was reported stolen in Patrick County. (*Id.*) Other serial numbers matched units stolen in Franklin County and Henry County. (*Id.*) According to Deputy Motley, Plaintiff was charged with grand larceny in each of those jurisdictions. (*Id.*)

After the initial interview, Deputy Motley returned twice to Plaintiff's residence. On this point, Plaintiff and Deputy Motley offer divergent accounts. Deputy Motley provides little detail, but indicates that on her second visit, she "spoke with Angela Reagans, who informed [her] that [Plaintiff] was not home, and after a brief conversation with her, [Deputy Motley] left the premises." (*Id.* ¶ 26.) During the third visit, she "spoke with [Plaintiff] directly and

---

[10] Deputy Motley reports that she "did not seize cutting tools that were also present with the units, even though in our investigation we had retained the cut pipes left at the scenes of the thefts to use for the purpose of comparing tool marks," because "at that time I was not certain that the tools were used in the commission of the thefts, and I did not have permission to take them." (Motley Decl. ¶ 23.)

requested that he submit to a polygraph." (*Id.*) Deputy Motley reports that "[h]e said he would consider it, and [she] left the property." (*Id.*)

Plaintiff, on the other hand, claims that on her second trip to his home,[11] Deputy Motley again "searched around the home" instead of first coming to the door and knocking. (Pl.'s Resp. 3.) On her third trip, Plaintiff claims that Deputy Motley arrived "in her personal vehicle, while wearing her badge and gun, with a young female, [Deputy Motley's] daughter in the passenger seat[.]" (*Id.*) Plaintiff states that Deputy Motley "walked passed [*sic*] [Plaintiff's] front door and walked to the backside of the home." (*Id.*) According to Plaintiff, he "walked outside and caught [Deputy Motley] coming back from the backside of the home the same way she had walked around the home, by way of the front at which time [Deputy Motley] stated that she was 'just checking things out[.]'" (*Id.*) Plaintiff claims that the young female remained in the passenger seat of the vehicle.[12] (*Id.*)

At his trial for grand larceny, Plaintiff moved to suppress all evidence obtained by Deputy Motley during her visit to his residence. The Circuit Court of Patrick County granted Plaintiff's motion to suppress any evidence obtained pursuant to the warrantless search of the curtilage of his property that occurred on September 17, 2011. *Commonwealth v. Henderson*,

---

[11] Although Angela Reagans allegedly told Deputy Motley that Plaintiff was not at home during her second visit, Plaintiff's version of events seems to suggest that he was present.

[12] In the Complaint, Plaintiff alleges that approximately two weeks after her first visit:

> [Deputy] Motley returned to the property in her personal vehicle, still displaying her badge and gun and once again walked all the way around the house searching the property. Seeing [Deputy Motley]'s shadow go by the window, I, [Plaintiff], got up and went outside and leaned up against her ([Deputy] Motley's) van. When coming back around the home [Deputy] Motley did not even attempt to go to the front door, but walked by it to get back to her van, then was she ([Deputy] Motley) able to see [Plaintiff] standing there, otherwise [Deputy] Motley would have just gotten in her vehicle and left.

(Compl. 2 [ECF No. 3].) It is unclear whether he is describing Deputy Motley's second or third visit to his home.

- 8 -

No. 1665–12–3, 2013 WL 431720, at *1 (Va. Ct. App. Feb. 5, 2013). The state trial court found that "while probable cause was present, exigent circumstances justifying a warrantless search were lacking, as 'Deputy Motley could have radioed for backup in order to obtain a search warrant' to ensure evidence was preserved." *Id.* at *2. According to the state court, Deputy Motley did not obtain consent, and could not rely on the plain view doctrine because she "did not have a lawful right of access to the units or the van because of their location on the property." *Id.* at *4.

On appeal, Deputy Motley argued for the first time that she was conducting a protective sweep. *Id.* The Virginia Court of Appeals declined to rule on the protective sweep, and affirmed the judgment of the trial court. *Id.* at *4, 7. Despite testifying at the suppression hearing, Deputy Motley now argues that the state trial court never learned of facts related to her inability to contact dispatch for backup, why she felt a protective sweep was necessary, or why she felt exigent circumstances justified taking the photographs. (Motley Decl. ¶ 27.)

On September 16, 2013, Plaintiff, proceeding *pro se* and *in forma pauperis*, filed a § 1983 civil rights action against Deputy Motley for alleged violations of his Fourth Amendment rights. (Compl. 1–2); 42 U.S.C. § 1983 (2014). Plaintiff is seeking $4,200.00 in compensatory damages, based on approximately three weeks that he spent in Patrick County Jail, and $100,000.00 in punitive damages, based on his claim that "any law enforcement officer would know what [Deputy] Motley was doing was in fact a violation of one's constitutional rights against illegal search and seizure[.]" (Compl. 2.)

On June 13, 2014, Deputy Motley filed a Motion for Summary Judgment and Memorandum in Support [ECF Nos. 13, 14]. On June 30, 2014, Plaintiff filed a Response to

- 9 -

Deputy Motley's Motion for Summary Judgment [ECF No. 20], and a separate, but untimely,[13] Motion for Summary Judgment [ECF No. 21]. On July 8, 2014, both parties appeared before me for a hearing on Deputy Motley's Motion. The matter is now ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment on a claim or defense as a matter of law. Fed. R. Civ. P. 56(a); *George & Co. LLC v. Imagination Entertainment Ltd.*, 575 F.3d 383, 392 (4th Cir. 2009). A genuine dispute of material fact exists "[w]here the record taken as a whole could . . . lead a rational trier of fact to find for the nonmoving party." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal quotation marks and citations omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute cannot be created where there is only a scintilla of evidence favoring the nonmovant; rather, the Court must look to the quantum of proof applicable to the claim to determine whether a genuine dispute exists. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson*, 477 U.S. at 249−50, 254. A fact is material where it might affect the outcome of the case in light of the controlling law. *Anderson*, 477 U.S. at 248.

Insofar as there is a "genuine" dispute about the facts, those facts are taken in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 380. At this stage, however, the Court's role is not to weigh the evidence, but simply to determine whether a genuine dispute exists making it appropriate for the case to proceed to trial. *Anderson*, 477 U.S. at 249. It has been noted that "summary judgment is particularly appropriate . . . [w]here the unresolved issues

---

[13] The Pretrial Order instructed the parties that "[a]ll Rule 12 and Rule 56 motions must be heard or submitted on briefs no later than 30 days prior to trial. To meet this deadline the moving party must allow adequate response time for the opposing party[.]" (Pretrial Order, Oct. 24, 2013, at 2 [ECF No. 8].) Trial is currently scheduled for August 11, 2014. (Notice, Nov. 5, 2013 [ECF No. 10].) Plaintiff's Motion for Summary Judgment, filed June 30, 2014, was therefore untimely and will not be considered.

- 10 -

are primarily legal rather than factual" in nature. *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004).

### III.     DISCUSSION

Deputy Motley moves for summary judgment pursuant to Rule 56 on the grounds that she is entitled to qualified immunity. (Def.'s Mot. Summ. J. 1 [ECF No. 13].) In support of her claim, she argues that "she lawfully entered the curtilage of the property for the purpose of conducting a protective sweep, and while lawfully on the property, she saw the evidence in plain view, and exigent circumstances justified photographing the evidence, which could not be otherwise secured." (*Id.*) Accordingly, Deputy Motley contends that her conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. (*Id.* at 11.)

For the reasons below, I find that Deputy Motley is not entitled to qualified immunity. In the absence of "specific and articulable" facts to support a concern for officer safety, Deputy Motley violated Plaintiff's clearly established Fourth Amendment rights when she searched the curtilage of his property without a warrant. Without a lawful right of access to the property, a subsequent search or seizure cannot be justified by the plain view doctrine or exigent circumstances. Plaintiff's claim for punitive damages, however, will be dismissed. Plaintiff has not alleged any facts to suggest that Deputy Motley acted with "evil motive or intent," or "reckless or callous disregard" for the federally protected rights of others.

#### A.   *Qualified Immunity*

As a rule, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982) (citations omitted). Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and protects "from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005) (citation and internal quotation marks omitted). Because qualified immunity is "immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), a court should determine whether a defendant is entitled to qualified immunity at the earliest possible stage. *Harris v. Hayter*, 970 F. Supp. 500, 503 (W.D. Va. 1997) (citing *Jackson v. Long*, 102 F.3d 722, 727 (4th Cir. 1996)).

The question of "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time [the action in question] was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citations omitted). In order to gauge objective reasonableness, "a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances." *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). If officers of reasonable competence could disagree on whether the conduct at issue was reasonable, a defense of qualified immunity should be recognized. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"When a police officer asserts qualified immunity, the legal inquiry often focuses not so much on the 'clarity' of the right allegedly violated as on whether the officer's actions 'clearly' infringed that right." *Tarantino v. Baker*, 825 F.2d 772, 775 (4th Cir. 1987). As the Fourth Circuit explained:

This may be particularly true when, as here, the civil suit is premised on a violation of the fourth amendment. The "meaning" of the fourth amendment, at least when stated in broad philosophical terms, is relatively clear. The precise action or combination of actions, however, which will infringe a particular suspect's fourth amendment rights is often difficult for even the constitutional scholar to discern because the legal doctrine has developed and continues to develop incrementally. Although some actions by a police officer must be held to violate "clearly settled" fourth amendment law even if no other reported case involves identical circumstances, there is often a "legitimate question" whether an officer's particular conduct constituted an improper search or seizure. When such a "legitimate question" exists, the principle of qualified immunity gives police officers the necessary latitude to pursue their investigations without having to anticipate, on the pain of civil liability, future refinements or clarifications of constitutional law.

*Id.* at 775 (citing *Anderson v. Creighton*, 107 S.Ct. 3034, 3039 (1987); *Mitchell v. Forsyth*, 472 U.S. 511, 535 n.12 (1985)). In this case, Deputy Motley's lawful presence in Plaintiff's backyard is an essential predicate for her arguments concerning the plain view doctrine and exigent circumstances. Accordingly, her entitlement to qualified immunity largely turns on whether it was objectively reasonable to enter the curtilage of Plaintiff's home without a warrant.

      B. *Protective Sweep of the Curtilage*

The Fourth Amendment "proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "The curtilage area immediately surrounding a private house has long been given protection as a place where the occupants have a reasonable and legitimate expectation of privacy that society is prepared to accept." *Dow Chemical Co. v. United States*, 476 U.S. 227, 235 (1986) (citing *California v.*

*Ciraolo*, 476 U.S. 207 (1986)); *see also United States v. Dunn*, 480 U.S. 294, 300 (1987) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)) ("[T]he Fourth Amendment protects the curtilage of a house . . . .").

One exception to the general warrant requirement is a "protective sweep." A protective sweep is "a quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). In order to conduct a protective sweep, the searching officer must possess a "reasonable belief based on specific and articulable facts" which, taken together with the rational inferences from those facts, reasonably warrants the officer in believing that the area swept "harbors an individual posing a danger to those on the arrest scene." *Id.* at 337. Although they are most frequently conducted during the course of an arrest, protective sweeps are not strictly limited to arrests.[14]

Deputy Motley argues that she lawfully entered Plaintiff's backyard to conduct a protective sweep in the interest of officer safety. (Def.'s Mot. Summ. J. 13.) In particular, she points to the following "articulable facts" to justify a protective sweep: (1) the three vehicles parked in Plaintiff's driveway; (2) the fourth vehicle with the open rear door behind the trailer;[15] (3) her petite size; (4) the fact that she was alone, in a remote area, with no cell service or radio

---

[14] As the Fourth Circuit explains, "[a]lthough *Buie* allowed for a protective sweep in the specific context of an arrest, several circuits have since held that a protective sweep is reasonable in other situations as well." *Pena v. Porter*, 316 F. App'x 303, 315 (4th Cir. 2009) (citing *United States v. Gould*, 364 F.3d 578 (5th Cir. 2004) (allowing protective sweep after deputy sheriffs entered a trailer home with occupant's consent); *United States v. Taylor*, 248 F.3d 506 (6th Cir. 2001) (approving protective sweep after consent entry of home); *United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993) (same)).

[15] At this stage, a genuine factual dispute exists concerning the visibility of the white van. In the light most favorable to Plaintiff, I must therefore assume for the purposes of summary judgment that the van was not visible to Deputy Motley until after she had deviated from the path to Plaintiff's front door and entered his backyard.

- 14 -

contact; and (5) Plaintiff's criminal history, including violent crimes, and attempting to escape from prison. (*Id.* at 15.) Further, she claims that she had recently "unwittingly comprised her own safety when she entered a mobile home under similar circumstances." (*Id.* at 16.) Deputy Motley argues that these facts support her belief that Plaintiff "could be in the possession of firearms and that he would not be afraid to harm someone in an attempt to escape apprehension or that any armed person could be in or near that van with the open rear door." (*Id.* at 15.)

Deputy Motley contends that her "protective sweep was circumscribed, however, extending 'only to a cursory inspection of those spaces where a person may be found,' and 'lasting no longer than it takes to complete the arrest and depart the premises.'" (*Id.* at 17 (citing *Maryland v. Buie*, 494 U.S. 325, 335–36 (1990)).) She claims that she had no reason to believe her conduct under the circumstances violated Plaintiff's rights because "protective sweeps of the curtilage of a home without arrest of any occupant of the home are provided for under Fourth Circuit precedent and precedent in other circuits[.]" (*Id.* at 13.) In support of her argument, she relies primarily on *United States v. Bernard*, 757 F.2d 1439 (4th Cir. 1985), a pre-*Buie* case which held that a protective sweep of the curtilage contemporaneous to an arrest was constitutional where the police officers had a reasonable fear for their safety.

In *Bernard*, police officers and DEA agents conducting aerial surveillance of marijuana fields observed several individuals from an altitude of 400-500 feet. *Bernard*, 757 F.2d at 1441. Once on the ground, officers were unable to locate a third adult they had seen from the helicopter. *Id.* at 1442. Concerned that this individual might pose a threat to officer safety, officers conducted a protective sweep of the curtilage of the home, at which point they observed a number of marijuana plants hanging from the rafters of an open barn. *Id.*

- 15 -

The Fourth Circuit concluded that the officers' fear for their safety was reasonable based on the following factors: (1) the officers' prior experience in securing other marijuana fields;[16] (2) their encounter with the neighbor's Doberman Pinscher; (3) the recently harvested marijuana they had seen in the field; (4) the value and commercial nature of the crop; and (5) the defendant's "evasive response to [an officer]'s question inquiring about the whereabouts of the missing person, which was inconsistent with what the officers had seen from the air." *Id.* at 1443. Because the Fourth Circuit found that a protective sweep was reasonable, it held that officers had a right to seize the marijuana hanging from the barn in plain view. *Id.*

A more recent case from the Fourth Circuit, however, discussed the *Bernard* precedent and emphasized the importance of "specific and articulable facts" to support a protective sweep in the interest of officer safety. In *Pena v. Porter*, 316 F. App'x 303 (4th Cir. 2009), officers searching for an escaped fugitive went to investigate the nearby property of another individual that they believed was "a little crooked" and might be inclined to aid the fugitive. *Pena*, 316 F. App'x at 306. After knocking on the door and receiving no answer, the officers began to search the curtilage of the property for the fugitive. *Id.* at 307. During the course of their search, officers "became suspicious" after they discovered burning candles, raw meat, beer cans, and a smoldering fire. *Id.* The officers later claimed that their search of the curtilage was justified as a protective sweep of the area. *Id.* at 315.

On appeal from the District Court's denial of qualified immunity, the Fourth Circuit noted that "protective sweeps are not justified as a matter of course," and "[o]utside of a home,

---

[16] Aerial surveillance on this date was part of a series of aerial surveillances for marijuana fields in Monroe County, West Virginia. *Bernard*, 757 F.2d at 1440. In the prior week, officers had discovered more than 30 such fields in the area, several of which were protected by a number of dangerous devices installed by marijuana growers to protect their crop. *Id.* These included "ankle and neck-high trip wires, barbed wire stretched across paths at eye level, pit-falls, steel traps, electric fences, guard dogs, such as Doberman Pinschers, and watch towers with loaded weapons. *Id.* at 1441. In the prior year, one of the officers had encountered a device designed to shoot a 12-gauge shotgun shell. *Id.*

- 16 -

the risk of danger to police officers is substantially diminished." *Id.* (citing *Fishbein v. Glenwood Springs*, 469 F.3d 957, 962 (10th Cir. 2006); *United States v. Carter*, 360 F.3d 1235, 1242–43 (10th Cir. 2004)). Discussing the relevance of *Bernard*, the Court explained:

> In the present case, the Officers' conduct cannot be condoned as a protective sweep because the Officers have failed to articulate specific facts demonstrating that they reasonably feared for their safety. The Officers point to the raw chicken, empty beer cans, and smoldering fire as evidence that people had only recently left the property, and Officer Barbour opined, "It's always an uneasy feeling when you got somebody on the run and you could be standing on top of that somebody and not know it." However, nothing in these facts suggests danger. Only an unsubstantiated "hunch" connected [the fugitive]—a nonviolent offender—with the Pena property. The scene that greeted the Officers upon their arrival showed no evidence of unlawful activity, and there was no reason to believe that the people who had recently been grilling chicken would pose any threat to the police. Although the Officers may have subjectively believed that the atmosphere that night was eerie, this is not a specific, articulable fact that indicates the Officers reasonably feared for their own safety.

*Id.* at 315–16. The Fourth Circuit held that the officers' conduct violated the plaintiff's clearly established Fourth Amendment rights, and affirmed the District Court's denial of qualified immunity.

In this case, I find that nothing in the facts or the rational inferences drawn therefrom provides a basis for reasonable officers objectively to believe that a protective sweep of the curtilage was necessary. The parked vehicles may well suggest the presence of multiple individuals. As with the empty beer cans, raw chicken, and smoldering fire of *Pena*, however, nothing about them provides any indication that these individuals might pose a danger to the police. *Pena*, 316 F. App'x at 315. Moreover, I am not persuaded by the improper introduction of subjective elements of her state of mind.[17] For the purposes of qualified immunity analysis,

---

[17] For example, Deputy Motley explains that:

the "reasonable officer" archetype is not an officer imbued with Deputy Motley's subjective beliefs or past experiences.

Further, as Deputy Motley points out, "[t]he linchpin of the protective sweep analysis is not 'the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house.'" *United States v. Jones*, 667 F.3d 477, 484 (4th Cir. 2012) (quoting *Buie*, 494 U.S. at 336). Her conduct during the "protective sweep" of the curtilage is inconsistent with the actions of a reasonable officer concerned with locating unseen third parties, and suggests that Deputy Motley's concern for officer safety was not as dire as she would have this Court believe. Without first going to the door to speak with anyone in the residence, she proceeded immediately to the backyard and discovered what she believed to be evidence of the crime that she had come to investigate. Without walking the remainder of the perimeter, or making any effort to find out whether anyone might be observing her actions from inside of the

---

A few months prior, [she] had unwittingly compromised her own safety when she entered a mobile home under similar circumstances. At that time, she was conducting an interview and entered the premises of the trailer with permission. There were multiple occupants of the trailer and multiple individuals outside, and from her vantage point, she could not determine the physical characteristics of those individuals, the number of individuals outside, or whether they possessed weapons, so she was left completely exposed to potential dangers posed from the subjects she could not see.

(Def.'s Mot. Summ. J. 16.) This information is irrelevant to the objective reasonableness of her conduct at Plaintiff's home. "Subjective factors involving the officer's motives, intent, or propensities are not relevant. The objective nature of the inquiry is specifically intended to limit examination into an officer's subjective state of mind, and thereby enhance the chances of a speedy disposition of the case." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994) (citing *Hunter v. Bryant*, 502 U.S. 224 (1991)). Unlike the "officers' prior experience in securing other marijuana fields" that the Fourth Circuit found relevant in *Bernard*, which dealt with officers' experiences during a one-week series of aerial surveillances in a single county of West Virginia, there is absolutely no relationship between Plaintiff and Deputy Motley's prior experience with someone else's mobile home. *See Bernard*, 757 F.2d at 1440–41. Accordingly, these experiences—and the resulting subjective fear for officer safety that they may have caused in Deputy Motley—have no bearing on the objective reasonableness of her actions.

- 18 -

mobile home,[18] Deputy Motley stopped and began taking a series of evidentiary photographs. Only *after* taking these photographs did she decide to knock on the door and inquire as to who might be in the residence. If her concern was "unseen or unknown" parties, the most logical place to find them would be inside the residence.

As a result, I cannot accept Deputy Motley's argument that her presence in Plaintiff's curtilage was anything other than a warrantless search. Taken in the light most favorable to Plaintiff, the facts indicate that Deputy Motley acted without probable cause and either a warrant or exigent circumstances. Doing so violated Plaintiff's clearly established Fourth Amendment right to be free from unreasonable searches. *See Pena*, 316 F. App'x at 316 ("Because the Officers searched the curtilage of Pena's property without probable cause plus either a warrant or exigent circumstances, the Officers violated Pena's Fourth Amendment right to be free from unreasonable searches, and this right is clearly established."). Accordingly, Deputy Motley is not entitled to qualified immunity.

### C. Plain View Doctrine

Deputy Motley contends that she came upon the air conditioning units in plain view during her "protective sweep of the van." (Def.'s Mot. Summ. J. 18.) "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). "It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990). Accordingly, Deputy Motley's argument must

---

[18] Deputy Motley states that she "had parked her police cruiser in plain view of the front door and windows of the trailer and knew that her cruiser had likely been seen by the occupants of the trailer." (Def.'s Mot. Summ. J. 20.)

fail.  Without lawful access to the curtilage of Plaintiff's property, the plain view doctrine cannot support the search or seizure of any evidence observed from that location.

### D.  Exigent Circumstances

Deputy Motley argues that exigent circumstances justify her decision to photograph the air conditioning units because "the evidence could have easily been removed from the property before [she] could obtain a search warrant and [they] were simply too large to seize[.]"  (Def.'s Mot. Summ. J. 19–21.)   The Fourth Circuit has held that exigent circumstances permit warrantless searches where police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant.  *See, e.g.*, *United States v. Cephas*, 254 F.3d 488, 494–95 (4th Cir. 2001).

"For police officers successfully to assert the exigent circumstances doctrine, they need only possess a 'reasonable suspicion' that such circumstances exist at the time of the search or seizure in question."  *Figg v. Schroeder*, 312 F.3d 625, 639 (4th Cir. 2002) (citing *United States v. Grogins*, 163 F.3d 795, 797 (4th Cir. 1998)).   Even when police create the exigency underlying the warrantless search, the exigent circumstances rule still applies as long as the "police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment."  *Kentucky v. King*, 131 S.Ct. 1849, 1862 (2011).

In this case, Deputy Motley was unable to see the air conditioning units until *after* she had already deviated from the path to Plaintiff's front door and entered the curtilage of his property.  Accordingly, there is no need to inquire further into the reasonableness of her decision to take photographs instead of seizing the air conditioning units as evidence.  Viewing the facts in the light most favorable to Plaintiff, Deputy Motley violated Plaintiff's rights under the Fourth

- 20 -

Amendment regardless of any exigency that arose after the fact. Because Deputy Motley "gain[ed] entry to [the] premises by means of an actual . . . violation of the Fourth Amendment," *King*, 131 S.Ct. at 1862, exigent circumstances cannot justify her subsequent actions.

### E. Punitive Damages

Finally, Deputy Motley moves to dismiss Plaintiff's claim for punitive damages. (Def.'s Mot. Summ. J. 21.) The Supreme Court has endorsed punitive damages awards in certain § 1983 actions. *See, e.g.*, *Smith v. Wade*, 461 U.S. 30, 56 (1983). Punitive damages are appropriate when a defendant violates federal law with "evil motive or intent," or when they act with "reckless or callous disregard" for the federally protected rights of others. *Id.* The award of punitive damages "is an extraordinary remedy and is designed to punish and deter particularly egregious conduct." *Stephens v. South Atlantic Canners, Inc.*, 848 F.2d 484, 489 (4th Cir. 1988) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268 (1981)). Considered in the light most favorable to Plaintiff, however, there is nothing in the facts to suggest that Deputy Motley acted with "evil motive or intent," or "reckless or callous disregard" for the federally protected rights of others. Accordingly, Plaintiff's claim for punitive damages will be dismissed.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, I find that Deputy Motley is not entitled to qualified immunity. In the absence of "specific and articulable" facts to support a concern for officer safety, Deputy Motley violated Plaintiff's clearly established Fourth Amendment rights by searching the curtilage of his property without a warrant. Without a lawful right of access to the property, a subsequent search or seizure cannot be justified by the plain view doctrine or exigent circumstances. Plaintiff's claim for punitive damages, however, will be dismissed. Plaintiff has not alleged any facts to suggest that Deputy Motley acted with "evil motive or intent," or

- 21 -

"reckless or callous disregard" for the federally protected rights of others. Accordingly, I will grant in part and deny in part Defendant's Motion for Summary Judgment. The Motion will be granted with respect to the claim for punitive damages, but denied with respect to Deputy Motley's claim that she is entitled to qualified immunity. Plaintiff's Motion for Summary Judgment will be denied as untimely. (*See* Pretrial Order, Oct. 24, 2013, at 2 [ECF No. 8].)

The Clerk is directed to send a copy of this Memorandum Opinion and the accompanying Order to Plaintiff and all counsel of record.

ENTERED this 22nd day of July, 2014.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE